# IN THE COURT OF APPEALS OF IOWA

No. 23-1452
Filed July 3, 2024

IN RE THE MARRIAGE OF CHELSEY JAON NUNEZ
AND ELIAS NUNEZ, JR.

Upon the Petition of
CHELSEY JAON NUNEZ,
    Petitioner-Appellee/Cross-Appellant,

And Concerning
ELIAS NUNEZ, JR.,
    Respondent-Appellant/Cross-Appellee.
_____

        Appeal from the Iowa District Court for Warren County, Thomas P. Murphy,

Judge.


        Petitioner and respondent each appeal from the decree dissolving their

marriage. **AFFIRMED AS MODIFIED ON APPEAL, AFFIRMED ON CROSS-**

**APPEAL, AND REMANDED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        Elizabeth Kellner-Nelson of Kellner-Nelson Law Firm, P.C., West Des

Moines, for appellee.


        Considered by Schumacher, P.J., and Ahlers and Langholz, JJ.

**LANGHOLZ, Judge.**

Chelsey and Elias Nunez met while working in the Polk County Courthouse. They married in September 2019. But two and a half years later they were back in another courthouse—Chelsey petitioned for divorce in April 2022. Both parties appeal the dissolution decree. They each challenge the property division on one or more grounds. And Elias also challenges his visitation with their two young children and the court's refusal to hold Chelsey in contempt.

First, we affirm the district court's roughly sixty–forty division of their Indianola acreage's proceeds on both the appeal and cross-appeal. Each party's efforts to claim all or nearly all of the proceeds miss the mark—the district court fairly balanced each party's contributions, the short length of the marriage, and both parties' post-petition misdeeds. Second, the decree appropriately permitted the parties to file separate tax returns for 2022—successful collaboration seems unlikely—and the court equitably allocated credits and deductions.

Third, we agree with Elias that the decree went too far in awarding Chelsey survivorship rights in Elias's IPERS pension, as the *Benson* formula protects her future interests and the short length of the marriage tips the balance of equities against a right of survivorship. Fourth, the visitation schedule is in the children's best interest because they are served by its consistency and it gives them meaningful parenting time with Elias. Fifth, we see no gross abuse of discretion in the district court's refusal to hold Chelsey in contempt, particularly because her failure to make vehicle payments was considered when apportioning the Indianola acreage proceeds. We thus affirm the decree as modified to remove the pension right of survivorship and award Chelsey $3000 in appellate attorney fees.

## I.     Factual Background and Proceedings

Chelsey and Elias met through work.  Chelsey was a judicial assistant at the Polk County Courthouse.  Elias was a juvenile court officer also working there. They started dating in 2012.  And after a period of separation between early 2017 and early 2018, they married in September 2019.  They share two young children—a five-year-old daughter and a nearly three-year-old son.

This case involves three real estate properties.  First, while they were dating, Chelsey and Elias built a home in West Des Moines, which the parties refer to as "the Beaverbrook home."  Though Elias paid the down payment and held the mortgage, Chelsey participated in the building process.  After construction was finished in July 2015, Chelsey lived in the home with Elias and contributed toward the mortgage each month.  This continued until their early 2017 separation.  When they reunited in early 2018, Chelsey again moved back into the Beaverbrook home and resumed contributing toward its mortgage.  Two years into their marriage, the couple sold the home.

Chelsey and Elias used part of the Beaverbrook home proceeds to buy a new property: an acreage in Indianola.  The Indianola acreage was a fixer upper. And Elias performed much of the remodeling work himself, though he used funds from the sale of the Beaverbrook home to pay for materials and other labor.  After separating, Chelsey and Elias sold the Indianola acreage, netting $128,564.69. Those funds were set aside in a trust account.

The final piece of real estate is a rental-income property in Des Moines, referred to as "the Crown Lane house."  Elias bought the Crown Lane house in 2005, long before his relationship with Chelsey.  During their marriage, Elias

leased the house to a tenant. Chelsey testified to sometimes assisting with rental functions, but it is undisputed she did not financially contribute toward this property.

Also at issue are six vehicles and motorcycles. Going into the marriage, Elias owned a Toyota Tundra and two motorcycles. He gifted Chelsey a Toyota Highlander in 2018. And during the marriage, Elias bought and traded several vehicles and motorcycles.

In April 2022, after roughly two-and-a-half years of marriage, Chelsey petitioned to dissolve the marriage. The court issued a temporary-matters order to resolve certain issues while the dissolution proceedings were pending. Relevant here, Chelsey was responsible for the Toyota Highlander and ordered to pay the vehicle's loan and insurance payments. After she failed to do so, Elias sought to hold her in contempt. Chelsey responded by seeking to hold Elias in contempt for his alleged failures to pay a satellite television bill and child support.

The parties reached agreement on some issues before trial. They both recommended joint legal custody of their two children. And they agreed that the children should be placed in Chelsey's physical care, with Elias having visitation. But the terms of the visitation schedule remained disputed. So was the property division and the parties' dueling contempt actions.

During the two-day trial, Chelsey and Elias often provided conflicting testimony. Indeed, the district court found "[b]oth parties lacked credibility." After weighing the evidence, the court issued a dissolution decree. Relevant here, the decree established joint legal custody, placed the children in Chelsey's physical care, and provided Elias with visitation. Elias's visitation schedule was set for every other weekend—Friday evening through Sunday evening—and every other

Thursday evening. On weeks where Elias did not have the children the coming weekend, the Thursday visit would be an overnight.

As for dividing property, Elias received his Crown Lane home and all vehicles except the Toyota Highlander, which went to Chelsey. The court split the Indianola acreage's proceeds roughly sixty–forty, with Elias receiving $75,282.69 and Chelsey receiving $53,282. The court explained Chelsey's share was diminished by her failure to make the Toyota Highlander payments as required by the temporary-matters order and Elias's expected capital gains taxes. The court also divided Elias's IPERS benefits "per the *Benson* formula," and further required Chelsey "be the contingent annuitant under option 4 or 6 in the amount of 50% joint and survivor death benefit." And it permitted Chelsey and Elias to file their 2022 income taxes separately, with Chelsey claiming child tax credits for both children and all daycare expenses and Elias claiming mortgage interest and other real-estate deductions or credits. Finally, the court refused to hold either Chelsey or Elias in contempt.

Elias now appeals, challenging three aspects of the property division—the Indianola acreage's proceeds, the 2022 taxes, and the survivorship rights in his IPERS pension—his visitation schedule, and the court's refusal to hold Chelsey in contempt. Chelsey also cross-appealed the division of the Indianola acreage's proceeds and seeks appellate attorney fees.

## II.     Property Division

We review a district court's division of property in a dissolution decree de novo. *See In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). Yet we are mindful of the district court's preferred fact-finding position and will only disturb

a decree when it fails to do equity. *See id.* at 703–04. In a dissolution decree, "[t]he court shall divide all property, except inherited property or gifts received or expected by one party, equitably between the parties." Iowa Code § 598.21(5) (2022). What is equitable "depends upon the circumstances of each case" based on consideration of the factors in Iowa Code section 598.21(5). *Hansen*, 733 N.W.2d at 702. "An equitable division is not necessarily an equal division." *Id.*

*Indianola Acreage Proceeds.* Elias and Chelsey both challenge the district court's roughly sixty–forty split of the $128,565.69 Indianola acreage proceeds. Instead, they each propose an allocation that awards themselves all or nearly all of the proceeds. But neither proposal is equitable.

Elias argues that because he and Chelsey were only married for a short time, his premarital assets should have been presumptively excluded from the couple's divisible property. In turn, to properly credit his premarital assets and contributions, he argues Chelsey's share should be limited to roughly $28,000— the marital equity of the Crown Lane and Beaverbrook homes—and he should receive the remaining roughly $100,000. Yet Elias's proposal is both incorrect on the law and inequitable under these facts.

First, Iowa equitably divides all property held by the parties—there is no statutory carveout for premarital property like there is for inheritances and gifts. *See* Iowa Code § 598.21(1). True, "[i]n marriages of short duration, an equitable distribution of property does not require an equal distribution of property." *In re Marriage of Naylor*, No. 17-0770, 2018 WL 5850223, at *3 (Iowa Ct. App. Nov. 7, 2018). And the "length of the marriage" and "property brought to the marriage by each party" are factors for the court to weigh. Iowa Code

§ 598.21(5)(a), (b). But so too do we consider "the contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services," among many other factors. Iowa Code § 598.21(5)(c).

Elias seemingly argues that because he bought the Beaverbrook home, and its proceeds were used to buy and remodel the Indianola acreage, he is presumptively entitled to all of the Indianola acreage's proceeds too. But like the district court, we find Elias's proposal minimizes Chelsey's contributions. Chelsey was actively involved in the Beaverbrook home—selecting the builder, choosing materials, and contributing monthly toward its mortgage. During their marriage, Chelsey and Elias together sold the Beaverbrook home and bought the Indianola acreage. All the while, Chelsey was the sole childcare provider and performed significant household work. So we find the Indianola acreage was a joint effort and thus decline to reduce the value of Chelsey's contributions to the slight appreciation of two pieces of real estate.[1]

At the same time, Chelsey's proposal is also flawed. Chelsey argues she should receive the entire sum—all $128,564.69—because Elias got the Crown Lane house and several vehicles and he improperly dissipated funds during the dissolution proceedings. Starting with the Crown Lane house and vehicles, Chelsey argued during trial that awarding Elias these assets resulted in him "walking away with quite a bit more," so she should receive all of the proceeds to

---

[1] Elias also argues that Chelsey's share should be reduced to account for Elias's assistance in paying off Chelsey's premarital debt. But even if such a credit were equitable, Elias offers no evidence showing the debt's amount or when it was paid. Absent this evidence, we see no basis to reduce Chelsey's share.

achieve parity. But we find the short duration of this marriage undermines Chelsey's strictly equal approach. *See In re Marriage of Hansen*, 886 N.W.2d 868, 873 (Iowa Ct. App. 2016); *Naylor*, 2018 WL 5850223, at *3 (explaining "in marriages of short duration, our courts are inclined to restore the parties to the status quo ante or are inclined to at least trend toward the status quo ante" and collecting cases).

Elias acquired the Crown Lane house long before his relationship with Chelsey, and Chelsey did not materially contribute to the rental property during their short marriage. He likewise amassed his vehicle and motorcycle collection largely without Chelsey's assistance. *See Naylor*, 2018 WL 5850223, at *4 (discussing uneven property distributions when "there was a significant disparity of assets brought into the marriage"); *In re Marriage of Miller*, 452 N.W.2d 622, 624 (Iowa Ct. App. 1989) (explaining one purpose behind considering what property each spouse brought to the marriage is to "prevent a spouse from being given an interest in property for which he or she made no contribution to acquiring"). So equity does not demand equalization of these assets.

Elias's dissipation is a tougher problem. When they separated, Elias and Chelsey had roughly $93,000 in a checking account—much of it still left from the sale of the original Beaverbrook home. Shortly after Chelsey petitioned to dissolve the marriage, the parties were restrained from disposing personal or joint property absent mutual agreement or leave of court. Despite this order, Elias spent roughly $34,000 from the checking account in October 2022.

Elias testified the funds went toward his credit card, and that he carried the substantial balance because of the financial strains of the dissolution—hiring

lawyers, completing the Indianola acreage projects so it could be sold, and paying two mortgages. The district court did not believe Elias's testimony that some money went to Indianola acreage-related projects, but it did not make any similar credibility findings about Elias using the credit card to pay attorney fees, the two mortgages, or other expenses that were not barred by the asset-protection order. So it is unclear how much of the sum was improperly spent.

Viewing the record as a whole, the court's allocation achieves equity. Elias's significant financial contribution to acquiring the property and the marriage's short duration favor Elias receiving a greater share of the proceeds. But his asset dissipation and Chelsey's childrearing and household contributions counsel against him receiving a substantially greater share. Indeed, the court explained Chelsey would have received closer to fifty percent of the proceeds had she not flouted the temporary-matters order and failed to pay roughly $5000 in Toyota Highlander payments. In the end, given Elias and Chelsey's contributions, we affirm the district court's allocation of the Indianola acreage proceeds.

*2022 Taxes.* Elias next disputes the decree's provision permitting the parties to file their 2022 taxes separately and allowing Chelsey to claim both children as dependents for that year.[2] But we find this decision both practical and equitable. Practically, the court had little faith that Elias and Chelsey could cooperatively file their taxes, so filing separately would ensure timely completion. And equitably, though the court authorized Chelsey to claim both children as dependents, it did so in exchange for Chelsey not seeking reimbursement from

---

[2] For the 2023 and later tax years, Elias and Chelsey will each claim one child as a dependent.

Elias for 2022 daycare expenses and for the two months where Elias did not pay child support. And Elias received all mortgage or other real-estate deductions. Because the decree fairly distributed tax burdens and benefits, we affirm.

*Pension Survivorship Rights.* Elias's final property-division challenge relates to his IPERS pension. Elias does not challenge that Chelsey is entitled to her share of the marital portion of his retirement benefits under the *Benson* formula while he is living or as a beneficiary if he dies before retiring.[3] But he asserts the decree went too far in granting Chelsey survivorship rights by requiring he designate her as the contingent annuitant to receive fifty percent of his benefits for her entire life if he dies after retiring and starting to receive benefits. In support, Elias points to the short duration of the marriage and his intent to remarry and one day designate a new spouse as his surviving spouse. Chelsey counters that without being the contingent annuitant, there is no guarantee she will receive the full share of her benefits.[4]

---

[3] In *In re Marriage of Benson*, our supreme court adopted a formula for determining a spouse's "share of any payout of a matured benefit from" the other spouse's "pension plan." *In re Marriage of Benson*, 545 N.W.2d 252, 255–57 (Iowa 1996).

[4] Despite the short duration of the marriage—and thus the presumably small marital portion of the pension—neither party seeks the alternative relief of valuing the "IPERS account at the refund value as of the time of trial and order[ing] a property equalization payment from" him to Chelsey "in lieu of dividing the IPERS account via a QDRO." *In re Marriage of Boland-Chambers*, No. 14-0920, 2015 WL 1849501, at *4 (Iowa Ct. App. Apr. 22, 2015) (finding an equalization payment more equitable given that "IPERS retirement options and the circumstances of the parties could be drastically different by the time the parties retire"). Because neither Chelsey nor Elias seeks this alternative arrangement, we do not consider it. *See In re Marriage of Duggan*, 659 N.W.2d 556, 560 n.2 (Iowa 2003) (noting the alternative possibility of an equalization payment and declining to pursue it because "neither party requests this method of distribution").

Deciding whether to designate a former spouse as a pension's surviving spouse in a property division turns "on the facts of each case and whether the allowance of survivorship rights effectuates an equitable distribution of the parties' assets." *In re Marriage of Duggan*, 659 N.W.2d 556, 560 (Iowa 2003). We considered the interplay between IPERS, the *Benson* formula, and survivorship rights in *In re Marriage of Dow*, No. 17-0534, 2018 WL 1858299, at *5–7 (Iowa Ct. App. Apr. 18, 2018). There, we clarified that while awarding survivorship rights could be equitable in the right circumstances, we could not say that such awards were "normal" or "typical." *Id.* at *7 (citation omitted). And we were reluctant to embrace a default rule that survivorship rights are necessary to protect a former spouse's future interests, as the *Benson* "percentage formula properly allocates risk between the parties." *Id.* (cleaned up). Ultimately, because of "the length of [the parties'] marriage," the spouse was entitled to be a beneficiary of any preretirement death benefits, but not entitled to be a contingent annuitant "because [she] was sufficiently protected by the other pension provisions." *Id.*; *see also In re Marriage of Smith*, No. 16-0597, 2017 WL 362000, at *6 n.11 (Iowa Ct. App. Jan. 25, 2017) (awarding spouse the marital share of a pension using the *Benson* formula but declining to designate her as the surviving spouse because *Benson* adequately protected her interests).

So too here. This marriage lasted roughly two-and-a-half years, and Chelsey was thirty-one-years-old at the time of trial. When we have granted survivorship rights, we have done so when the marriage spanned most of the pensioner's career. *See In re Marriage of Miller*, No. 19-0969, 2021 WL 603237, at *3 (Iowa Ct. App. Jan. 21, 2021) (collecting cases extending survivorship rights

in long marriages and holding "we are not persuaded that the length of the marriage warranted an award of survivor benefits"); *aff'd in relevant part,* 966 N.W.2d 630, 635 (Iowa 2021). And even in long marriages, we have found it equitable to forgo a contingent annuity in favor of the parties receiving a higher monthly payment during the pensioner's lifetime. *See In re Marriage of Sullins*, No. 14-1153, 2015 WL 4935620, at *4 (Iowa Ct. App. Aug. 19, 2015).

Consistent with this approach—and without meaningful advocacy from Chelsey on why the circumstances here warrant any deviation—we grant Elias's request to modify the decree to remove the requirement that he designate Chelsey as his contingent annuitant to receive IPERS joint survivor death benefits. Because this is the only change Elias seeks on appeal, the remaining IPERS portions of the decree—including the requirements to designate Chelsey as a beneficiary for preretirement death benefits and to elect IPERS Option 4 or 6 upon retirement—remain intact. We thus remand the case for the district court to enter a new QDRO consistent with this opinion.

### III. Visitation

We next consider Elias's challenge to the visitation schedule. Like the property division, we review the district court's decision de novo. *See Hansen*, 733 N.W.2d at 690. And as always, we focus on what is best for the children. *See id.* at 695. In that pursuit, we recognize that children are often best served by "stability and continuity." *Id.* at 696. So while "liberal visitation is the benchmark," we review visitation schedules through the lens of the children's best interests,

rather than the lens of "the parent seeking visitation." *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994).

During trial, Elias proposed a graduated visitation schedule, which incrementally increased his time with the children over four years. His proposed schedule at first gave him only one overnight every fourteen days and would gradually ramp up to six overnights by 2026. But the district court found this was too inconsistent for the children. And we agree the children are best served by the decree's consistent schedule.

Elias has the children every other weekend and every Thursday, with alternating Thursdays being an overnight visit. Elias thus receives both weekend and midweek time, allowing him "to become involved in the [children's] day-to-day activity as well as weekend fun." *In re Marriage of Ertmann*, 376 N.W.2d 918, 922 (Iowa Ct. App. 1985). We also find it significant that, under this schedule, Elias now has more time with his children than his plan allotted. Indeed, he received in 2023 the time with his children that his own plan had deferred until 2025.

Ultimately, Elias is a capable father who loves his children, and this visitation schedule allows ample opportunity to bond with his children while also preserving stability and continuity in the children's daily lives. We thus affirm the decree's visitation schedule.

## IV. Contempt

Elias also asks us to hold Chelsey in contempt for failing to pay the Toyota Highlander's loan and insurance, contrary to the temporary-matters order. *See* Iowa Code § 598.23 (allowing contempt actions against any person who "willfully disobeys" a temporary order or final decree in a marriage dissolution proceeding).

Unlike Elias's challenges to the decree, which we review de novo, the district court has "broad discretion" over contempt matters. *In re Marriage of Swan*, 526 N.W.2d 320, 327 (Iowa 1995). We will only reverse in the unusual instance when the court's discretion is "grossly abused." *Id.* (cleaned up). And we do not find the court's decision to refuse contempt grossly unreasonable. Although Chelsey indeed never made the vehicle payments, the court accounted for that failure when apportioning her share of the Indianola acreage proceeds. So we cannot say Chelsey went unpunished, nor can we say Elias was blameless. Because the district court did not grossly abuse its discretion, we affirm the court's decision to resolve Chelsey's noncompliance through means other than contempt.

### V. Appellate Attorney Fees

Finally, Chelsey asks us to award her $4650 in appellate attorney fees. Awarding appellate fees is discretionary, and we are guided by Chelsey and Elias's abilities to pay and Chelsey's required defense of the decree. *See In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa 2007). Because she has largely prevailed in Elias's appeal—but not her cross-appeal—and she has less ability to pay, we award Chelsey $3000 in appellate attorney fees. Appellate costs shall be split equally between the parties.

**AFFIRMED AS MODIFIED ON APPEAL, AFFIRMED ON CROSS-APPEAL, AND REMANDED.**